Page number 15-1118, et al. Emera Maine, formerly known as Banger Hydro Electric Company, et al. Petitioners versus Federal Energy Regulatory Commission. Mr. Raskin for Petitioner's Emera Maine Utility. Mr. Pomper for Petitioner's Attorney General of Massachusetts Customers. And Ms. Taxella for the Respondents. Page number 15-1118, et al. Good morning. My name is David Raskin. I'm representing the New England Transmission Owners who are Petitioners. We raised two issues before the Court. On the first issue, this case involves the Commission's decision to change an existing rate under Section 206 of the Federal Power Act without first finding that the existing rate was outside the zone of reasonableness under the statute. Two cases in this circuit hold directly to the contrary. They are Papago Utility Authority v. FERC and City of Winfield v. FERC. In both of those cases involving different factual circumstances, the Court held that the Commission must first find that the rate is entirely outside the zone of reasonableness before it can act under Section 206. The Commission does not ask this Court to overturn either Papago or Winfield. Neither case is cited in the Commission's brief. They are asking you to disregard those holdings. We urge you not to because they are the law. There is a third principle that the Commission's decision violates based on longstanding law. And that is that Section 206 of the Federal Power Act requires a two-step process. First, the Commission must find that the existing rate is unjust and unreasonable, and then and only then can it proceed to the second stage and determine a single new just and reasonable rate. If the finding that a single rate is just and reasonable satisfies both prongs, there is no longer a two-step analysis under Section 206 in this case and in any other case. And, therefore, the Commission needed to come to this Court and explain why this Court should overrule longstanding precedent that supports the fact that a two-step analysis. You never did overrule precedent. Do you understand that? Yes, I do. Okay. Thank you. Well, and in PAPAGO, my reading of PAPAGO is that they essentially did the two findings at the same time through the same study and rejected this argument that you have to sort of formalistically march through one rather than the other since you're going to do the same survey and then produce the information. That is not my reading of PAPAGO, Your Honor. In PAPAGO, the utility had waived its right to make a Section 205 filing. And, therefore, the rate could only be changed pursuant to Section 206. Because that was the case, the Court needed to search the record carefully and determine whether the existing rate was entirely outside the zone of reasonableness before it could be changed by the utility under Section 206. They didn't make that right. The Commission, and I'm reading from 956, the Commission did not make such a finding because it thought it was going under Section 205. That's correct. The factual circumstances are unusual. No, but then just the reality is that there you didn't have this sort of – you may have other challenges to whether they made a reasoned determination of unjust and unreasonable. Your Honor, the – This ordering thing just isn't in PAPAGO at all. I understand that it's unusual for the Court to make a finding that the Commission did not. But in the second half of the decision, the Court searched the facts in great detail and determined that because the existing rate afforded a return on equity that was so low, I believe it was slightly above zero, that the existing rate was entirely outside the zone of reasonableness, and therefore it could be changed under Section 206. In addition, the Court held that because the Commission had found one ROE to be just and reasonable, other ROEs within the zone of reasonable were not necessarily unjust and unreasonable, and it therefore contradicted one of the Commission's central tenets in this case. Later, in Winfield, the Court held that Section 206 provides a zone of protection for utilities. The Court specifically recognized the importance of rate stability under the Federal Power Act. The electric power industry is the most capital-intensive in the country. Utilities spend billions of dollars in investments on new facilities, and if the rates are subject to a hair-trigger change without a finding that they're outside the zone, you are undermining the need to raise investment capital on a consistent basis. And in fact, as a result of the Commission's holding in this case, we now have four complaints pending against New England transmission owners, which will probably leave their ROE up in the air for a decade or more. Can I ask you about your argument that your rate was not unjust and unreasonable because it was within the new DCF zone? That's correct. Do you believe that any rate anywhere within that zone that the new DCF calculated was necessarily just and reasonable? Not unjust and unreasonable. Section 206 requires a threshold finding that the existing rate is not unjust and unreasonable, and the cases hold that if the existing rate is within the zone of reasonableness, it is not unjust and unreasonable for purposes of that threshold determination under Section 206. And your position is that not unjust and unreasonable is not the same as just and reasonable?  Yes, there is. I'm not sure I followed what you said. It sounded to me like you misspoke or I misheard. Your position is that 206 requires first a finding that it is unjust and unreasonable. That's correct. And all I heard you say is not unjust and unreasonable. I'm sorry. I meant to say it is. I may have misheard. Well, I gave away my case, and I apologize. I would like it back. So it's semantics, I guess, and I can't disagree. There's a double negative there. I really would like an answer to the question whether once a DCF is calculated, every rate within that zone is just and reasonable. Yes, for purposes of the threshold analysis under Section 206. Is there a different just and reasonable for that than there is for the same language throughout the statute? It is the same language, but Section 205 does not require a two-step process. So how the zone of reasonableness is incorporated. I'm asking you whether it's just and reasonable. Yes, Your Honor, it is. Does that mean the same thing in every aspect of 206, both the first step and the second step? No, just the first step. We agree that in the second step, the commission has to determine a specific rate, and once it's determined that the existing rate is outside the zone of reasonableness, it has the discretion. Anything within the zone of reasonableness, do they have discretion to decide that anything within the zone of reasonableness is not unjust and unreasonable? No, they do not. Wow. Is that absolute necessary to your case? You made the absolute statement just then that anything within the zone of reasonableness, the commission cannot properly find that it's unjust and unreasonable. Am I correct in what you're saying? For purposes of the threshold analysis, I think that in the second step, the statute requires to set a particular rate. It is a practical necessity that in setting a particular rate in the second step, they've got to pick a particular rate within the zone of reasonableness, and that's what they do, and we don't argue that that's incorrect, and that they have to pick the rate at the high end of the zone. We have never argued that. So they say the statute says you just have to charge a just and reasonable rate, correct? That's correct. So you could pick any rate within that zone, including even a higher one than the commission picks, and you would be consistent with the statute because you would be just charging a just and reasonable rate. Well, under Section 206, we don't get to pick a rate. I don't think that you violate the statute by charging a rate that's within the zone of reasonableness. We do not violate the statute, and the commission's decisions. So even if you pick one, the commission has said we think it should be measured, they pick the midpoint here, and you said thank you very much. We see that our 11.4 is within the zone of reasonableness. We're sticking with that. That is not our position, Your Honor. But why isn't it your position? It would be just and reasonable. Because we believe there is a difference between what the commission has to find in the first step of the Section 206 analysis and what the commission must find in the second step. There would be a range of rates that could be found to be just and reasonable. And then the commission has to … The commission has to, at the threshold, the commission has to first find that the rate is not within that range of rates that's just and reasonable. Forget about the term of art about the zone. That's correct. So it's a different finding. It is a different finding, and if it were not a different finding … Then the commission could go straight to the step of finding just and reasonable rates. But since it's a 206, the commission has to go through this first step first under PAPAGO and the other cases. That's correct. That is our position. And we don't challenge the fact that the commission has to, and it's statutorily directed, to find one single rate within the zone of reasonableness in the second step. If it couldn't do that, then it couldn't satisfy its responsibility. Is it sufficient for them to say that, look, market conditions have changed materially since the original rate was set? It was just and reasonable when set. The world has changed materially. We cannot rely on the process that produced that number. We need to do a new calculation. Would that satisfy the first step? Only if the DCF analysis showed that things actually had changed materially and the existing ROE was outside the zone of reasonableness. I want to be crystal clear here. I want to make sure we're very specific about the language we're using. So they say market conditions have changed materially. Right. We can no longer trust the process that produced that number. If it was just and reasonable at the time, it's still being just and reasonable today. So we are going to calculate a new DCF zone. We're not going to call it a zone of reasonableness. We're going to call it a DCF zone. And on the basis of that calculation, determine that the old rate is unjust and reasonable and a new rate should be charged. Can they do that? Well, no, because the DCF zone is the zone of reasonableness. The commission has called it that, the statutory zone of reasonableness. The zone of reasonableness is not a statutory term, though. The statute doesn't require a zone of reasonableness. No, but the case law, I mean, is just rampant. So it would be possible for the commission to render a decision, just as the presiding judge describes, that doesn't use the term zone of reasonableness but could still find that the rate was unjust and unreasonable. Is that not the case? No, that's not the case. Why not? Hapago and Winfield hold that a rate has to be entirely outside the zone of reasonableness. That is the law. So you would say that it's a magic, the zone of reasonableness, controls over the substance of a decision that said this rate is unjust and unreasonable because, and then what's the next one? So my argument is that what is unjust and unreasonable is not kicked out of the air. What the DCF does is requires the commission to do its math. So if the commission believes that circumstances have changed and the rate maybe ought to be changed, the DCF and the zone of reasonableness tells whether or not that change is significant enough, material enough, to warrant making a change under Section 206 and overriding the Hapago and Winfield. I'm still not at all certain that I understand why the commission would have to use the term zone of reasonableness if it did an explanation of why the rate was unjust and unreasonable. I'm not asking you to say that they did such an analysis here. But if they did, would it be invalid simply for not using the term zone of reasonableness? I think it would, Your Honor. I'm not sure that's necessary to the holding in this court, but in this case. But I believe that that is part of the case law under the statute, that the zone of reasonableness is a critical concept and it needs to be respected in setting rates under Section 206. But in this case, they didn't find any zone. They found their particular rate. Only one point was just in reason. Thank you. Actually, I wanted to. You have a couple other arguments, and it's fine. You can go on with your time. You had this argument about notice about your incentive adders. Yes. Given that the commission's rule that the DCF zone, the top of that, caps the ultimate rate, so the ROE plus the incentive adders can't go over the top, that was well established. I don't understand you challenging that rule in this case. So given that you knew that rule was there, they told you it was there, it would be enforced in this case, what more would you have argued if they had given you the notice you say you were entitled to to challenge the effect of the cap on your incentive adders? Well, when the commission sets the cap on an incentive, it's only looking at one particular project. So at the time it establishes the incentive ROE, it looks at that project and determines whether or not the incentive puts the ROE above the high end at the time the incentive is established. That does not mean that later when it has a 206 proceeding that that incentive is subject to reconsideration when it becomes part of a rolling rate in which the overall ROE is not above the zone of reasonableness. And I would argue, Your Honor, that if the commission continues to interpret the law that way, they're undermining the purpose of Section 219. That sounds like a different argument. That was your argument about the specific project, the finding of the inability of a specific project. I'm asking about your notice argument, which is a procedural argument, that you weren't given notice that your incentive adders might be clipped off in this process. And what I'm asking you is not about that argument, which I took as a different issue, but had you gotten the notice that you say you should have gotten about the potential impact on incentive adders, what would you have argued that you didn't already argue? We would have argued that Section 19 was enacted by Congress because there had been for several decades inadequate investment in new transmission facilities in this country. And Congress determined that incentives needed to be provided to get transmission utilities to build new transmission assets. The average age of our transmission grid is over 40 years today, and the New England TOs are in the middle of modernizing the one in New England. If the commission is going to grant an incentive, that's saying to investors, you are going to make more money, so come in and give us your money and invest in the transmission grid. If the commission turns around a year later and says, whoops, you're no longer above the high end, some or all of that incentive is gone, to someone who's made an investment in a long-lived assets, that's closer to bait and switch than an incentive. I thought you had made that argument to the commission on rehearing. Is that incorrect? We may have, yes. Okay. So then even if there was a notice violation, it was harmless because you made the argument to the commission. You haven't told me yet what argument you would have made if given more notice that you didn't get to make. Well, I think the commission didn't address the argument on the merits. The commission simply found that it had been their earlier holding that it's tapped at the high end. So the commission never analyzed whether or not what they're doing is consistent with the policy under Section 219. That's a different argument than a notice, and that's just a lack of sufficient reasoning argument. I guess so. It kind of gets there. Can you explain to me how it is? I take it your position is that you certainly don't disagree at least with the commission's decision now in Step 2. They didn't do Step 1, but once they were in Step 2, they did the DCF zone, looked at the midpoint, and said we can't rely on that. Right. And this time the DCF calculations can't be relied on to incorporate these anomalous economic conditions. Right. And in light of the fact that all of the other models that the commission used show the higher. That was part of evidence as to why they couldn't rely on the DCF calculations as they normally would. That's right. So why is it reason to rely on the top part of the DCF calculation to get your rate? If the DCF calculation is flawed because it's not incorporating information it needs to incorporate, what on earth makes the top quarter any less flawed? I think the commission recognizes that you can't determine what the actual equity cost of capital is. The entire exercise is to attempt to infer something that you can't get from the marketplace itself. Unlike a bond yield, for example, of 7%, the cost of equity is not known. And so the commission uses tools to try and estimate that cost of equity. And the primary tool it uses is the DCF. At some point the realities of the world have to coincide with the regulatory process. So the commission does the best it can in Stage 2 to find a single ROE that is just and reasonable. But if everyone agreed, you agreed. Yes, we did. The DCF just didn't work this time the way it normally does. So why should we trust the top quarter? Why should we trust that midpoint rather than the other midpoint? What reasoned explanation is there for thinking that was the right way to fix the problem? Because the ROE that they set at the high end of the mid-quarter was comparable to the model results. No, it was not at all. No, it was not. No, the four methodologies they used all came in way lower than that. No, that's not true. I think every one of them came in lower than the rate you got. Do you dispute that fact? No, I do dispute that fact, yes, Your Honor, for sure. Did you say all four of them came in with the number? Well, maybe. My memory is not that good. It might have been three out of the four. But clearly the others were showing that the midpoint was too low. I got that they showed the midpoint too low. But I didn't read any of them as saying the top quarter midpoint. The top midpoint was where it should be. They were all under that, as I read the record. If you read the record differently, it would be very much helpful to know that. I do. And I'm going by memory, please. But my recollection is that if you could let us know when we get up on rebuttal, which numbers were on both sides of the number you finally got, that top quarter, so that that was actually a midpoint. Can I make another point about the number we finally got? The Commission changed methodologies in this case at the decisional level. While it may look like they went out of their way to give us more, if you apply their old methodology, which had a much higher high end of the zone of reasonableness, you will see that the result is not very different from what we would have gotten if they had not changed it. We did not for that very reason. All right, thank you. Thank you. David Popper for customers. For decades, Burke was married to a single way of setting base returns, the discounted cash flow method, DCF. As the increases, Burke faithfully followed the DCF up. We're here because for no clear reason, Burke refused to follow the DCF down. It thereby violated the fundamental teaching of Hope Natural Gas that returns should follow the market cost of capital as it rises and as it falls. DCF was Burke's way of quantifying that principle. The reason Burke relied on DCF is that it infers the cost of capital at any point in time from utility stock prices, which embody all information known to investors as to what capital costs at any point in time. And this complaint was brought to ask whether the cost of capital had declined since Burke relied on DCF to set the New England return a decade ago. To answer that question, Burke ran its own DCF analysis. Let's just start answering it. They analyzed 41 comparable risk utility stocks, discarded the lowest three results, and were left with an array of 38 DCF data points, clustered mainly around nine. But then Burke locked off the 21 lowest results, leaving it with a truncated distribution of only the 17 highest results, and it set the return above all but three of those. So Burke hacked his DCF analysis into pieces and buried most of them, the parts most useful to customers. Now, Burke tried to smooth over that burial by saying that, well, market conditions are anomalous in some ill-defined way, and by saying that customers had agreed market conditions were anomalous, which we had not. They speculated that that anomaly somehow distorted the DCF result. They didn't explain the cause. And so they cited low interest rates, but they didn't explain how those affected the analysis. So their analysis here is even more opaque than in Tennessee Gas. Can you explain to me how the DCF would have incorporated the already low, super low, historically low Treasury bond rates? The DCF is based on dividend yields, which consists of the dividends the stock's actually paid, divided by the actual market stock price and growth estimates. The stock prices incorporate efficiently all relevant information. That's what Tennessee Gas is really all about. And so the interest rates known to investors, expected by investors, factor into the prices, and they factor into them in good times and bad. Burke? Was the Commission relying on the DCF and other cases around the same time without departing from it, even though the market conditions would have been exactly the same? Yes, Your Honor, and exclusively so. Burke has relied only on DCF for decades. He relied on it during the turbulent market period following September 11, 2001. That was the Public Service of Kentucky case. He continued relying on it on cases before, during, and after the 2008 financial crisis. In the Pacific Gas and Electric case, months before this case went to hearing, Burke relied exclusively on DCF, summarily, and summarily directed the utility to use the median of a DCF range. You said it was right before this hearing, but was it covering the same time period? That one was covering a period a couple years before, and then in the Seaway case decided after this one, that relied on a study period that overlapped the one here. Three of the six months were in common. And, in fact, the months Seaway involved a slightly earlier period with slightly lower interest rates, and Burke again relied on the DCF without adjustments. Burke, of course, also relied on the DCF here to set the incentive cap, and Burke has never explained why DCF was reliable for that purpose, but not for purposes of setting the actual base return. I thought you would argue that it wasn't reliable for using the top quarter midpoint rather than the normal midpoint. The normal midpoint isn't going to work, so we're going to take the top half, divide that in half, and use that midpoint. We're going to use the top half midpoint for the top quarter. I don't know how else to describe the top quarter midpoint. On what basis do they have to think that was reliable? It's not clear, other than saying that DCF continues to work for that purpose. And now Burke turned to four other methods that he had previously spurned to tell it to set the return above the midpoint. He had previously rejected each of those methods for reasons, many of which continue to apply, and they never explained why they were more reliable now than they were then. But the only thing that Burke said it took from those methods was that the return should be set someplace above the middle. It didn't want to see how far above they pointed. And, in fact, if you go through them one by one and you look at them critically following the logic that Burke applied in his decisions, none of them point unequivocally above the top quarter. They all, as a collectivity, point below the top quarter. And it may be useful to go through them one at a time. The state cases were really the most important thing Burke looked at, and there's no dispute. Over the two-year period that Burke looked at, they were generally in the low tens, well below 10.5, and by the most recent information in the record, they were averaging 9.75, so well below the 10.57 that Burke set. Capital asset pricing model, Burke plainly relied on the median there because it gave two different numbers for the midpoint. Excuse me, it relied on the midpoint because it gave two different numbers for the median. At the midpoint, it was 10.4, so again, below 10.57. And it would have been even lower had Burke applied the second-stage GDP growth constraint that Paragraph 113 of Opinion 531B demands, logically. Risk premium, produced a number slightly above 10.57, but it did so based on a math error. We've explained it on brief, and Burke has not had any counter to it. And with a math error corrected, it points no higher than 10.22, and there are other errors which would probably be even lower. Expected earnings, the median of that distribution was 10.2. And Burke says on brief, well, if any of these are above, then that's enough, that's a sufficient reason you can affirm it, I need to be in the ground. That's not what his first opinions say. First opinions say they're all above, and it's not clear what they would have done had they realized that the cap down, for example, points below the midpoint. So an explanation really is sorely needed as to why the DCF wasn't working here, and Burke hasn't given it. I would also point to footnote 306 of opinion 531. That framed the rules for subsequent cases, including the next New England complaint, which it said for here in the same day. It said that we will consider every point in the DCF range. So how did Burke exclude all the options between the midpoint and the upper midpoint? It did so based on a formalistic rule that in regional cases we only do midpoints, yet at the same time it said we don't want to do midpoints. In Kentucky it could do the midpoint, the midpoint at the full range, not the midpoint at half the range, and the reason it did that was because the endpoints of the full range emphasized the cost of the region's highest and lowest cost utilities. That logic does not carry forward as a basis for using the top quarter because the lower cost utilities in the region, represented by the 21 data points that Burke buried, are relevant to determining what well fits the region. Burke simply ignored that. Kentucky also says not to use the midpoint if the distribution is highly skewed, and adopted a test for skew based on the jumps between adjacent points. Applying that same test here to Burke's truncated 17-point distribution, it is highly skewed, so the midpoint doesn't fall from that either. In other cases, Burke had not used the upper midpoint in any comparable circumstance. It had set returns all over the range, including in the prior New England case, including in the cases cited in Judge Sentelle's error decision last year. There's been no rule that we only do midpoints, and the only two cases Burke cites as having done midpoints did so because there was no other information in the record pointing to any other point in the range. So they're left with this formalistic rule, like they sort of tantamount to empiricism, but the decision is not empirical. It's based on this formalism that, well, we do midpoints, except maybe next time we won't, and we don't always. So it doesn't really hang together. There may be some basis on which Burke can rationalize this result, but they haven't done so yet. So the remedy you would seek is for us to set aside Burke's decision and remand it for further proceedings? That's correct, Your Honor. I see my time is up. I'd have to ask Your Honor further questions. Otherwise, I reserve the place and ask for a call. All right. Thank you. Good morning, Your Honor. Beth Petalba, Burke. I think I'll start with the customer issues first, since that's where we were, where we ended. Let me first start talking about why the commission chose 10.57 as the just and reasonable rate. Can I, Betsy? I'm sorry. Of course. Just to back up. I'm worried some in this case that people aren't using the same language for the same meaning, or I'm misunderstanding the language, and it's probably more likely the latter. When you talk about the DCF zone, and you talk about a zone of reasonableness, are those necessarily the same thing? The commission uses the term zone of reasonableness in the DCF analysis. What that is is a zone of reasonable returns for proxy company utilities. So it's an industry zone of reasonableness. The commission determines the zone, the particular just and reasonable return on equity, base return on equity for the particular utility or utility that issued before it. By looking at that zone as a broad zone, not as a zone of reasonableness that we use for other, like cost of service rate, the rate itself, but the component of the rate. Am I understanding the zone of reasonableness? It then takes that and looks at the circumstances related to the particular utility or utilities before it and determines within that zone of reasonable returns, industry returns, what the just and reasonable zone is for the particular utility. So when the Supreme Court talks about a zone of reasonableness, or some of our prior cases, I had read that, it was more just recognizing that the relevant factors will not commonly dictate a single number for FERC to pick and that, in fact, it's not that an entire calculated zone, whatever it ends up looking like, are all reasonable, but simply that there is room for judgment by the commission. Certainly, that's absolutely right. In the process of doing that, do you dispute the proposition advanced by the petitioner that under a 206 analysis, the commission must first find existing rates to be unjust and unreasonable, unjust or unreasonable or both, before moving to the definitive step of determining a new rate that is just and reasonable? I think in most circumstances, Your Honor, that is how it works, that it is a one-step, two-step. But in this circumstance, with the return on equity component of the rate of service, that is done in one step. I don't understand why that would not be required, or I don't understand if you can explain why that would not be required in any 206 analysis, as opposed to a 205. I think that if you look at, which we said in our brief, Public Service Company of New York, 642 F. 2nd, 1335, at 1350 note 27, there the court said, if that case shows that collapsing in the ROE context, the two steps of 206 into one is okay. Did the commission say that in this case? Did the commission say that? I'm sorry. Did the commission say that in this case? Yeah, sure, that's what the commission, what the court said there was the commission's conclusion that only rates between 13.5 and... In the case before us, did the commission say why it was pre-permitting the first step of the 206 analysis? I don't know, I'm sorry, I don't know what you mean by pre-permitting, but the commission did it, but the commission said yes, that opinion 531B at JA 116 to 17, paragraphs 32 to 33, the commission said because the commission finds only a single base return on equity just and reasonable, showing that the return on equity methodology now produces a numerical value below the existing numerical value inherently establishes... I'm sorry, which paragraph are you reading from? I'm not reading from, I'm paraphrasing what the paragraph, but it's at 531... We would rather you would tell us what the commission said, because we have to decide based on that. Sure. I don't want to post on justification. No, no, it's in 531B, JA 116 to 17, paragraphs 32 to 33. And it's as well in 530B, JA 112, paragraphs 24, but I think paragraphs 32 to 33 are more clear.      I'm sorry, I'm not reading that. So, if you see in paragraph 32, the commission explains that it sets the numerical rate... Tell me what the commission said. Okay, the commission said... I don't have that JA in front of me right now. Oh, I'm sorry. And I would like to know... Of course, Your Honor, I apologize. JA 116, paragraph 32, the commission said, quote, the commission has long required the use of DCS methodology to determine a zone of reasonableness with a lawful, just, and reasonable return on equity set at a single numerical point within that range based on the circumstances and record of that case. Therefore, when the commission finds a utility's base return on equity to be just and reasonable in a particular case, it finds only, and the commission emphasizes only, that's italicized, that single point to be just and reasonable given the facts and circumstances of the case. It doesn't find any other just and reasonable base ROE within the zone of reasonableness,  for that utility or group of utilities. Thus, and then it says, in that same paragraph, quote, it follows that showing the existing base return on equity established in the prior case is unjust and unreasonable, merely requires showing that the commission's return on equity methodology now produces a numerical value below the existing numerical value. Thank you. And it goes on. Yeah, you deal with what I missed. I appreciate it. Thank you. I appreciate that. Thank you. And so the commission's point is, in this circumstance, both steps happen at the same time. And, again, there's nothing in the statute that says you must do step one before step two. That's certainly not an explicit holding. The commission gets to interpret the statute. The statutory text is pretty close to saying that. Well, the commission has interpreted it. I did look at that as well, of course, Your Honor. Isn't your better position, rather than saying the statute doesn't require it, to say that you did it, you simply, you didn't leave out the first step, you simply combined it. Sure, that's exactly right. Are you bound by prior judicial determinations that require two steps, like in Winfield and Papago? In Winfield and Papago, the Winfield case was not a return on equity case, Your Honor. And Papago was, and if I can get to that in one second, and I want to get to that, but can I point out, yes, we are certainly bound, as is the petitioner, as petitioners are. As I mentioned before, Public Service Company of New York said, the commission's conclusion that only rates between 13.5% and 14.3% are just and reasonable supports its, excuse me, fulfills the requirement of Section 5, which is the same thing as Section 206 here, on both necessary findings. So that case shows that the commission can, in appropriate circumstances concerning ROE, can, it's okay in the ROE context to make those findings through the same step, because that's how the commission determines what the just, there's only one just and reasonable base ROE, so finding a new one means definitionally that the old one is no longer just and reasonable. I thought in Papago they had, the whole point was that they hadn't done it, and we figured out why it was okay. Papago, I think that's true, Your Honor, and the other point of Papago, which is not as clear from the opinion if you don't work at FERC and understand, at the time of Papago, FERC determined return on equity completely differently. It didn't use proxy companies. It determined the base return on equity zone of reasonableness for a particular utility by using different analyses with the utility's own numbers. So there was no proxy done at the time. And so when the commission talked about the zone of reasonableness, when the commission talked about the zone of reasonableness in Papago, it really was the zone of reasonableness for that particular utility, because it was always using the utility. So when the court said finding that particular ROE within that zone of reasonableness is no longer just and reasonable, but it sets a new ROE there, it didn't mean the other ones were no longer just and reasonable, because they really were potentially just and reasonable returns on equity for that particular utility. So it was done completely differently. Now the zone of reasonableness really doesn't mean the zone of reasonableness for a particular utility. It really just means in the industry. But I'm curious about your argument that any time you calculate a new DCF and you get a new point that you pick on there, it necessarily means the other one was unjust and unreasonable. What if they were only off by a tenth of a percent? I would imagine that there's a de minimis finding. That's certainly not the circumstance we have here, and I don't know of any case. But sure, I mean, if there's a... Well, that's the rationale. The rationale is if we got one number, the other one must be unjust and unreasonable. And now you're saying, well, a tenth of a percent might not be, although a tenth of a percent can be an awful lot of money. That's really just me quantificating, I'm sure. Based on the commission's precedent, there would be a new just and reasonable DCF. So the old one was unjust and unreasonable. The old one was unjust and unreasonable. Even if it's off by a thousandth of a point. There's a problem with the notion that just because we calculated a new number, the old one was necessarily wrong because, again, the recognition of a zone of reasonableness, not the DCF zone, but a zone of reasonableness, suggests that there is at least some margin for judgment in there so that you could actually have two numbers, both of which could be determined to be just and reasonable. Well, what the commission does in each case is look at the particular circumstances. And so after it comes up with this zone, the DCF zone, it looks at the particular circumstances in the case. And that, I guess, would leave open for the committee. Wouldn't it be a lot easier right this minute if the commission had done the first step of the analysis explicitly and said this is unjust and unreasonable. Therefore, we can move to step two. I'm sorry, Your Honor. Why shouldn't the commission go through the two steps here? Because the point, as the commission explained, the way you find out whether the existing DCF ROE is just and reasonable, the particular HROE is unjust and unreasonable, is by determining the new just and reasonable. You do a new analysis. So there's no difference between 206 and 205 as far as the analysis is concerned? There is. The difference is the commission then will make a finding the old one is unjust and unreasonable. Did they make such a finding here? The commission did. The commission found that it was short in paragraphs 32 and 33. The ALJ found it as well, that the prior. Sure, that finding is here in these orders. I don't think anybody disputes that. And then the other difficulty here is that the commission calculates this DCF and then says, actually, we can't really rely on the DCF to have captured anomalous economic conditions, unspecified, although there's a reference to treasury rates. There's no actual explication of what the anomalous economic conditions are. I would disagree with that, Your Honor. I think the commission did explicitly rely it is the treasury bonds. Where does it explain why this methodology, which for years it has said captures information in the market and was using it the exact same time, the exact same year for the same time period, in this case, was not reliable because it didn't capture treasury bonds. Did it, in other cases, capture treasury bonds? Let me first say, so I don't forget to say this, and I'll get right to that, Your Honor. The customers did not argue to the commission that you can't rely on the upper portion of the DCF or any portion of the DCF because it's not reliable, because of this anomalous concern. They argued the exact opposite. They never made that argument. The concern you have, Your Honor, was not presented to the commission by the customers. They never argued you can't rely on it. The whole rationale for the commission's decision to not use the midpoint was that the DCF was not reliable in this case. That's JA-127. Right. It was wrong. And the customers said the commission's wrong about that. There's no anomalous concern here, and if there is, they said— No, but if you take the commission at its word, then what honor basis do they have for going, And so let's just use the other end of that squad set of numbers that we have, and let's just pick a different midpoint. Let's just pick a midpoint because we like midpoints. And again, and it's important for purposes of the court's jurisdiction to address and to base their determination here on an argument that wasn't presented to the commission. No one argued to the commission, you can't—if you find that the DCF is not— The commission has to have a reasoned analysis. No one has to say, by the way, you have to have a reasoned analysis. They have to have a reasoned analysis. And when they say the DCF is broken, so let's just do a different point on the DCF. Without any explanation as to how that was consistent or advanced the Bluefield Hope factors or why it was any less broken on that end than it was in the middle, that's a lack of reasoned decision-making, isn't it? No, the commission's concern here only was that the—possibly that the— why it looked at these other analyses in the first place was that it was concerned that possibly the capital market conditions that were anomalous were not being incorporated into the DCF analysis for purposes of using the midpoint of the entire zone. That was the commission's concern. And where do they explain—it may be or may not, I'm not an economics expert, but why—where do they explain why, given the nature of the design of the DCF and its long-standing assumption that it's incorporating market information, where do they explain why it couldn't be relied on this time in this case to have included those treasury rates? I think, first, the commission really just had a concern, and that was based on just the notion which is in—which the commission talked about in Opinion 531B at J127, Paragraph 50, where it cited Morin for the proposition that all methods of estimating the cost of equity are susceptible to error when their underlying assumptions are anomalous. And so the commission said—and Morin, which the commission cited at 28, talks specifically about the DCF. Even the DCF analysis is susceptible to being skewed by anomalies. Sure, sure. Where do they say which anomaly, here, and why treasury rates wouldn't be part of the ordinary stock market information that they are already incorporating by using this collection of information from existing utilities? The commission explained that it was—the commission explained— it looked at—it talked about bond yields at 531J70, note 285, and it talked about— That's a long way away from this now. That's a different opinion, in fact, altogether. Well, the two opinions go together. But that's a long way from explaining here that treasury was the singular anomalous condition when they talked about plural conditions. And they still—they can say all day it was anomalous, but that doesn't— why is it anomalous? Why wouldn't the information factored in just like you normally assume that the market is efficient? And the numbers you collect are going to reflect all factors, including, well, you know, treasury is really low. So I think the answer to that, Your Honor, is, again, what I was just talking about, how that record showed there and also concerning model risk, which was addressed at 531J70-71, paragraph 145, note 286, and 531J22, paragraph 41. The commission explained that, again, those things talk about how any model, including the DCF model, can be skewed. So the commission's concern, again, and the commission said this specifically at 531J70, paragraph 145, and 531BJ126, paragraph 49, that the concern here was it had less confidence that the midpoint of the zone accurately reflected the equity necessary to make hope in Bluefield. You know, that's part of the problem. I mean, that's another one of the concerns I have because in the re-hearing decision, they say the DCF is the problem on 127, but in the initial decision, they said the midpoint is what we don't trust, a JA70. So they weren't even consistent between the first decision and the re-hearing decision as to what the problem was. I'm sorry, where is that in the re-hearing report, Your Honor? So JA70 said the midpoint. And then 127, which is I read it, and again, tell me if I'm wrong, it sounds like we don't trust the part you were just telling me, we don't trust the DCF. The DCF model can't be relied on when economic conditions are anomalous. Those are two different things. The commission's only concern, the commission stated every model has problems. The commission did say that, and I'm sorry, I don't have the paragraph cited for that. The commission in these orders said every model has problems. Our preferred model remains the DCF analysis. It's still the best model. So when the commission had this concern that the midpoint might not satisfy the capital attraction standard of Bluefield and Hope, it said, you know what, we're going to just check. We're going to see. We're going to compare it to what state-authorized returns on equity are and these other expected earnings and capital assets and the risk premium. And it looked at all of those different things, and it saw that, wow, all of those things would provide a return on equity higher than the midpoint here, than 9.39. So all of the numbers were higher than the 9.39. Then the commission's next step was, okay, now we know that maybe the ñ now we know our concern that the midpoint of the DCF isn't sufficient is corroborated by these analyses. Now we're going to use, we're stepping back and we're going to look at our precedent. What do we do when we have to increase above the midpoint of the entire zone? And the commission first said, well, we look at central tendency, and then it said, and we have these cases where our precedent shows that we use the midpoint of the upper half, actually use the central tendency in the cases that the commission cited. It was a single utility, so they used the median. But here you use the midpoint because this is a multi-utility return. Where did they say that doing that would take care of the anomalous conditions unspecified and would satisfy the HOPE Bluefields factors? I saw that nowhere. I saw them say we don't trust the midpoint, the DCF can't be relied on like it normally is here. So we like midpoints. Let's pick a midpoint. That strikes me as the ultimate in arbitrary decision-making. As they said, and we think that will reflect the right information because it's in the vicinity of some of these other models. But they said, no, we're not looking at those other models for our particular number. We just like midpoints. Your Honor, and the commission's like of midpoints as showing as appropriately being inclusive of the bottom number and the top number, and therefore encompassing all of the utilities that the return on equity will apply to. That's been affirmed by this court. I mean, the commission didn't come up and say, hey, let's just pick the midpoint. We like midpoints, and so we're going with the midpoint. The commission did that as well here. I mean, the commission just followed its precedent here. This isn't just out of the blue. The commission and consumers energy had a circumstance where it knew it needed to go above the midpoint of the zone, and it applied the midpoint of the upper half of the zone, and it did as well. But it explained there because it didn't have the DCF itself didn't capture the relevant information, didn't capture that they were anomalous, and that was the only record information they had to go on. No, actually, it wasn't the only record they had to go on. If you look at SoCalEd 92461070 at 61266, the commission had specific information. It said, given the conflicting evidence in the case on the issue of risk, we find that the updated financial data is the best quantifiable measure. So it was using updated financial data rather than the data that entities wanted them to use in the case. And so it had specific updated financial data, and then it determined at 6126667 that the appropriate return on equity for SoCalEd should be above the midpoint of returns indicated for the comparison group. Therefore, we will establish SoCalEd's return on equity at the midpoint of the upper half of the zone of reasonableness, and it cited consumers energy. So in circumstances where the commission knows it needs to go above the zone in a consumer's energy, which was in 1998, the commission uses the midpoint of the upper half of the zone. Petitioners are not citing any case post-consumer's energy which the commission did anything different. That's what the commission does. So it was consistent with this precedent, and it followed, and that precedent, using the midpoint has been affirmed by this precedent. In that case, specifically found that the DCF did not reflect market conditions. No. Yes. What the concern there was that the DCF zone did not show. I guess my bit of a question is why would the top half, without further explanation, this could be explained. Why would the top half, the top quarter reflect market conditions when the half does not? I think that, and particularly the Hope Bluefield ones, which the commission doesn't make any effort to say is what that number will satisfy. I would have thought the companies would be saying it should be higher. You can't just pick the midpoint. You have to explain that it satisfies Hope Bluefield, and in fact, even that midpoint doesn't. We need higher. The commission certainly addressed Hope and Bluefield, I mean, incredibly, and it's mentioned all through these orders. So, the commission had, the Hope and Bluefield have no traction standard. You have to say the number you pick is satisfying, though. I didn't see it. Sure, well, that's the whole purpose. The commission said we can't, well, well, Your Honor, I do disagree with that because the commission, the whole point in why it didn't rely just on the midpoint. No, I get what you're saying. I get that completely. That's why it said the midpoint's no good. So, then its job is to say what will meet Hope Bluefield. And that requires an explanation as to how just picking this midpoint on the top half will satisfy Hope Bluefield. I don't know why the companies couldn't get up and say that midpoint wasn't high enough. In fact, our old rate was just unreasonable, and that's when they meant Hope Bluefield, and you dropped the ball by not doing that. I think Your Honor wants something more exacting in return on equity than you're going to get. It's based on proxy information. There is no exact. It's not like you know that if you order what the cost, there are certain costs that a utility has that are specific, like your cost of labor. So, you know exactly how many employees you have and how much you pay them, and you know exactly what that is, and you can pick that exactly. This is a bit more amorphous than that. It's all based on proxy. That's probably not against you, though. Exactly. No, I think in terms of the commission. What do you do? You know, I noticed in your brief you don't address Papago. You don't address the city of Bloomfield. Sure. You don't address the town of Halpine. Sure we do, Your Honor. Well, I don't find it in your fable of authorities. The city of Bloomfield, our point is, and I... But let me read this to you, and you tell me. This is a FERC opinion from 2009, and it says, We note that the courts in this commission have recognized there's not a single just and reasonable rate. Instead, we evaluate tariff provisions to determine whether they fall into a zone of reasonableness. There's a range. Now, if that's true, and the commission still adheres to that, then the fact that the commission comes up with a number of 10.57 doesn't make the existing rate of 11.14 unjust and unreasonable. That wouldn't follow. So what do you do with language like that? That's not the only FERC case. No, there's a myriad, but those are not return on equity cases, Your Honor. Other than Papago, which I've already explained, that was a different circumstance. The zone of reasonableness. I don't understand why that matters. Because return on equity is, there is, the commission has determined, and the commission in its discretion does get to, it's a rate matter. The commission has determined that return on equity does not have a zone of reasonableness. It has a particular point that is just and reasonable. The commission has interpreted that the 206 perfection. You just said it's amorphous. No, no. What I mean is it's amorphous. The commission then has to use its judgment. Then I misspoke, and I didn't misspeak. I misrepresented what I was trying to say. I just wasn't clear. My point is the commission is using a proxy circumstance where it then has to use its own judgment as to where to place it. And here the commission used its precedent. It followed its precedent. Some of which is affirmed by this court. Some of which just didn't come to court. And it followed its precedent. And there is not one case that petitioners are citing post-consumers that sets the return on equity at a different point than at the midpoint of the upper half. This is how the commission has been doing it for decades. The 11.14. That came as a result of that. That was their prior just a reasonable base return on equity based on the prior DTF zone of reasonableness. It was the midpoint of that zone. Was the 205 proceeding? Was there a proceeding? It was. Yes, it was, Your Honor. Okay. Yes. So the difference is that the 11.14 was set by the transmission. And the 10.57 is set by the commission. That's the difference. That's one difference. Yes, that is true. But the point is, in both circumstances, the commission determined the just and reasonable return on equity. For example, in the prior case, in which Bangor Hydro, I believe, is where it was decided, the prior return on equity. In that case, if the petitioners had been trying to get the median rather than the midpoint, the commission, what just like happened in the SoCalEd proceeding, this court affirmed the commission's determination that everything within that zone is not just and reasonable. The commission says that the midpoint is the just and reasonable point, not the median, or vice versa, depending on whether it's a one-utility return on equity or a multi-utility return on equity. Could you repeat the analysis in the 205 proceeding? Of course. And came up with a zone of reasonableness? Came up with a zone of industry. What was that zone? The zone was 7.3 to 13.1. And the zone here was 7.03 to 11.74. So how did the commission determine that the 11.14 was just and reasonable? That was the midpoint of the 7.3 to 13.1 zone. There was no allegation here, just like there's been in no other proceeding before the commission recently, to address your concern, Your Honor, I believe. First of all, the Seaway case is post this record, and the Brooklyn Union Gas case from this court indicates that the court can't consider post-record orders of the commission. We don't know what the commission will do on the hearing. You don't know what... Well, I guess these treasury notes have been low for a very long time. They've been historically low for a very long time. So if DCF doesn't capture it, I'm shocked that you just keep using it. This is the first time that the allegation has been raised, Your Honor. Well, but now you've identified the problems. Shouldn't the commission on its own make sure it doesn't use it in other cases if it said it can't capture it? If the commission doesn't consider that on its own in future cases, Your Honor, then that's something that if it comes before this court, this court can address that. Or maybe the fact that the DCF was reliable the next month suggests that the explanation here is insufficient. But that's not something that under Brooklyn Union Gas, Your Honor, that this court is allowed to consider. And that may be frustrating. I'm sorry that that is the court's precedent. And I think it makes sense because if the commission made a mistake, my point is the commission made a mistake in Seaway, not made a mistake in this case. And I'm not defending the Seaway orders here today. Any questions? All right. Thank you very much. We've kept you up for a long time. Thank you. I appreciate it. If there's nothing else the court wants me to address. Thank you. Okay. Thank you for your time. Okay. So I have your answer. First, Your Honor, the METOS did not set the 11.14. The commission set the 11.14 as a result of a litigated proceeding. The METOS asked for more. So there is no difference in that respect, except it was a 205 case instead of 206. Judge Millett, I would turn your attention to joint appendix page 72 and 73, which are paragraphs 147 and 148 in opinion 531. The METOS risk premium analysis was found to determine the cost of equity between 10.7 and 10.8 percent, which is above the 10.57. The CAPAN analysis determined a range of 7.4 to 13.3 with a midpoint of 10.4 and a median of 10.9. And the expected earnings analysis, a range of 8.1 to 16.1 with a midpoint of 12.1. Well, the state rose, so 89 percent of them were below 10.57, correct? On the state ROE, 89 percent were below 10.57? I don't know about that, but recall that the midpoint was... And then the median on expected earnings was 10.2. And the CAPM midpoint is 10.4. But the midpoint... That's not much supporting 10.57. All I'm trying to say is that there were a number of these that were much higher than the 10.57 and as high as 12.1. The point on the state ROEs is that the midpoint was 9 through 9. The states were 9, 8 to 10.74, and the commission found that transmission is a riskier business. How can we be below the very lowest state? And so the commission made a judgment to move it up. Do you think that top midpoint was the right place for you to land? Well, we believe, Your Honor, that it should be 11.14 as a matter of law. And there was no explanation for why they were picking that midpoint instead of your higher number? I mean, that's the thing with them collapsing the two steps here and then just picking that number and not explaining it. I'm just surprised you haven't complained more about that. Maybe I'm not as good a lawyer as I should be, but... The commission had to exercise a judgment. I think the key point here is this is trying to infer a number. There is no one correct number, and that is one of the reasons that they're finding that only 10.57 is just and reasonable. It doesn't really make a lot of sense economically or financially as well as legally. Thank you. Any more questions? Thank you. Okay, thank you very much. Your Honor, there was discussion earlier of the possibility of a de minimis standard. This is not such a case. Every basis point here is worth more than a million dollars out of Red Bear's pockets. So the commission really needed to articulate some basis for why it adjusted the return upwards by 118 basis points from the midpoint to the top quarter. And the idea that we just do midpoints doesn't cut it. All right. Putting up 306 with opinion 531 is really pivotal. That's where the commission laid out guidance to future cases. And it said we will consider every point in the range. And it cited precedent where the court had said that it can't be confined just to two points. Sorry, is that in the JA? I just don't have that one. Yes, it is. It's the underlying order. It's putting up 306 with opinion 531. Which JA page are you on? Sorry. I don't have that at my fingertips. I'll look at it later. It's okay. And the commission also cited consumer's energy that came up in the earlier questioning. The key point about consumer's energy is that the way the commission did the DCF there is it averaged across the dividend yields of all the proxy companies and averaged across the growth rates for all the proxy companies. So you came up with a single DCF result. It didn't have an array of 38 data points as we have here. The array that the commission has said provided them with robust information about the New England transmission owners. I would say we've done this point before. When we found problems with the DCF before, we've just picked the upper midpoint in the past, too. They've landed at a wide variety of places in the range. Only in circumstances, however, where it's not that they didn't distrust the DCF. They distrusted that the DCF was measuring the cost of capital for the particular company at issue or for the right period. So before this Court Southern California Edison decision in 2013, they would adjust based on treasury yield trends between the DCF study period and the time that the rate was being set for. That's why you had that 74 basis point difference instead of the 11.14. The DCF finding in that case actually was 10.4. So they've gone up from that finding, strangely. The other rate basis, the most common basis on which they would adjust within the range, was because of a finding that the proxy group was measuring a set of companies with a different risk than the utility at issue. And they sort of gestured toward that explanation here. And I think in 531, they said, we can adjust when there's a different risk. But they backed off that in 531B. They said, no, actually, this proxy group is risk representative. There's no dispute about that. And therefore, the precedent in Consumers Energy and Southern California Edison for varying from the midpoint simply doesn't apply, because we have a representative number here. Any other questions? Thank you very much. The case is submitted.
judges: Millett, Sentelle, Randolph